IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| BAMBI MATTILA,<br><br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br><br>NORTHWESTERN COMPANY, dba<br>NORTHWESTERN ENERGY<br><br>　　　　　　　Defendant. | CV 23-79-BU-SPW<br><br>ORDER ON MOTION FOR<br>SUMMARY JUDGMENT |

Before the Court is Defendant NorthWestern Energy's ("NorthWestern") Motion for Summary Judgment. (Doc. 35). NorthWestern moves for summary judgment on all remaining claims asserted against it. (*Id.*).

This motion has been fully briefed and is ripe for review. (*See* Docs. 36, 42, 51). For the following reasons the Court grants NorthWestern's motion.

I.  **Background**

Bambi Mattila began working as a Real Time Scheduler ("RTS") for NorthWestern in 2008. (Doc. 4, ¶¶ 8–9). As an RTS, Mattila's role primarily involves trading energy in the hourly market. (*Id.*, ¶ 10). RTSs manage wind, hydro, and thermal resources by buying and selling power to balance NorthWestern's supply and load. (Doc. 37, ¶ 3). Throughout 2022, Mattila began to believe that

1

male employees in similarly situated roles were receiving higher salaries, given larger raises, and receiving additional training. (Doc. 4, ¶¶ 22–26). According to Mattila, male NorthWestern employees told her that they were receiving annual raises of up to 5% or higher in years where she received raises under 3%. (Doc. 48-4 at 10, 37:16–24). When Mattila asked her supervisor, Doug Peoples, about the disparity in annual raises percentages, he told her that "We all do the same job; therefore, they deserve to make the same pay." (*Id.* at 10, 39:12–14). Mattila believed that male RTS employees were getting higher raises to get their pay closer to female RTS employees. (*Id.* at 10, 39:15–18).

Mattila suspected that the male employees were getting preferential treatment because they had gone to Butte Central Catholic High School, played on the football team, and were "Butte people." (*Id.* at 8, 32:19–23). Mattila described this as an "old-boy's network" where employees with personal connections from growing up in Butte helped each other get better roles and higher pay at NorthWestern. (*Id.* at 8–9, 32:19–33:4). Specifically, Mattila believed her supervisor, Doug Peoples, treated her differently based on her gender. (*Id.* at 18, 70:7–8).

Based on this belief, Mattila filed a Charge of Discrimination with the Montana Human Rights Bureau ("MHRB") and the federal Equal Employment Opportunity Commission ("EEOC") on January 10, 2023. (Doc. 4, ¶ 28). On August 7, 2023, the MHRB concluded their investigation, finding no reasonable

cause to believe unlawful discrimination occurred as alleged in Mattila's Complaint. (Doc. 50-1 at 7). On the same day, the EEOC adopted the findings of the MHRB and did not determine the merits of Mattila's claims. (Doc. 37-9). The EEOC issued a Notice of Right to Sue letter to Mattila. (*Id.*).

Mattila now alleges a claim under the Equal Pay Act ("EPA") (Count I), Title VII discrimination claims (Counts II and V), and requests punitive damages based on her supervisor's, Doug Peoples, intentionally discriminatory actions. (Doc. 4; Doc. 30). Counts III and IV of the Amended Complaint were dismissed based on a stipulated motion between the parties. (Doc. 31). Under Counts I, II, and V, Mattila alleges that NorthWestern discriminated against her because (1) her salary is below what similarly situated male RTS employees make; (2) male RTS employees regularly receive larger annual raises than female employees; (3) male RTS employees are given preferential treatment in obtaining training opportunities; and (4) NorthWestern treats the outside training as a basis for providing pay increases and better employment opportunities at NorthWestern. (Doc. 4, ¶¶ 32–35, 39–42, 63–66).

## II.    Legal Standard

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable factfinder to return a verdict for the nonmoving party. *Id.* "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party fails to discharge this initial burden, summary judgment must be denied; the court need not consider the non-moving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party cannot defeat summary judgment by merely demonstrating "that there is some metaphysical doubt as to the material

4

facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Matsushita,* 475 U.S. at 587.    "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson,* 477 U.S. at 255.

### III.    Discussion

NorthWestern moves for summary judgment on Counts I, II, and V, along with the punitive damages claim. (Doc. 36).    NorthWestern moves for summary judgment on Count I because Mattila has consistently had a higher wage than other male RTS employees, has received raises in line with other male RTS employees, and has been offered training opportunities not given to other RTS employees, both male and female. (Doc. 36 at 14, 17–19).    NorthWestern moves for summary judgment on the Title VII claims because even if Mattila can establish a prima facie case of discrimination, NorthWestern has credible evidence of legitimate, non-discriminatory reasons for its compensation decisions.  (Doc. 36 at 20).  In response,

Mattila argues that the essential point of her claim is that NorthWestern's reliance upon job-related criteria for any differences in pay is pretextual reasoning. (Doc. 42 at 10).

The Court will evaluate each of these arguments in turn.

## A.    Equal Pay Act (Count I)

Mattila alleges that NorthWestern violated the EPA by paying her a lower salary, giving her smaller raises, and not offering her the same training opportunities as other similarly situated male employees. (Doc. 4, ¶¶ 32–34). NorthWestern argues that summary judgment is proper on this claim because, aside from one male employee, Mattila has been paid a higher wage than all other male RTS employees, Mattila has no evidence to support her claim that NorthWestern has given higher raises to male employees because of their gender, and Mattila has received training opportunities that other male RTS employees have not received. (Doc. 36 at 11–19). In response, Mattila argues that there is a genuine question of fact as to whether her pay was artificially stifled because of her gender. (Doc. 42 at 12).

"The Equal Pay Act is broadly remedial, and it should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve." *Corning Glass Works v. Brennan*, 417 U.S. 188, 208 (1974). The EPA embodies the basic principle that "employees doing equal work should be paid equal wages

regardless of sex." H.R. Rep. No. 309, 88th Cong., 1st Sess. 2, *reprinted* in 1963

U.S. Code Cong. & Ad. News 687, 688. The EPA provides that

> no employer ... shall discriminate between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions ....

29 U.S.C. § 206(d)(1). There are four exceptions to the EPA mandate. Different pay

is permitted if the payment is made pursuant to a: "(i) a seniority system, (ii) a merit

system, (iii) a system which measures earning by quantity or quality of production;

or (iv) a differential based on any other factor other than sex...." *Id.* The Ninth

Circuit has clarified that the fourth exception comprises only job-related factors.

*Rizo v. Yovino*, 950 F.3d 1217, 1224 (9th Cir. 2020).

The EPA's four exceptions operate as affirmative defenses. *Corning Glass*,

417 U.S. at 196–97. Under the EPA, an employee bears the burden of establishing

a prima facie case of wage discrimination by showing that "the employer pays

different wages to employees of the opposite sex for substantially equal work."

*Maxwell v. City of Tucscon*, 803 F.2d 444, 446 (9th Cir. 1986). Once the plaintiff

puts forth a prima facie case of pay discrimination, the burden shifts to the employer

to justify the difference under one of the EPA's four exceptions. *Corning Glass*, 417

U.S. at 196. The employer must demonstrate that the proffered reasons actually

explain the differences in wages not just that they could potentially explain the

differences. *Rizo*, 950 F.3d at 1222 (citing *EEOC v. Md. Ins. Admin,*, 879 F.3d 114, 121 (4th Cir. 2018)).

From 2020–2024, Mattila was paid more in annual salary than all but one male RTS, Tom Michelotti. (Doc. 37-2 at 72–75). As of October 2024, Mattila was the highest-paid RTS at NorthWestern. (*Id.* at 77). The Ninth Circuit has held that the "proper test for establishing a prima facie case in a professional setting … is whether the plaintiff is receiving lower wages than the *average* of wages paid to all employees of the opposite sex performing substantially equal work." *Hein v. Oregon College of Educ.*, 718 F.2d 910, 916 (9th Cir. 1983) (emphasis added). Here, Mattila can only demonstrate that one male RTS employee at NorthWestern was paid higher wages than her. On average, Mattila was paid more than the male RTSs in her work group.

Even assuming Mattila could establish a prima facie case of wage discrimination based on Michelotti's annual salary, NorthWestern has proffered legitimate job-related factors for the difference in pay under the EPA. Michelotti holds an electrical engineering degree, is a licensed professional engineer, had 17 years of experience working as an RTS when he was hired in 2020, and had 21 years of experience studying NorthWestern's transmission system. (Doc. 37-2, ¶¶ 12–14). Further, Michelotti had experience in the Energy Imbalance Market ("EIM"), which NorthWestern considered a valuable asset because they were attempting to

8

expand into it. (*Id.*, ¶ 15). In comparison, Mattila has a fine arts degree in photography, had thirteen years of experience as an RTS in 2020, and no experience in the EIM market. (Doc. 37-2 at 79–81).

Mattila argues that NorthWestern's reliance on Michelotti's credentials is a pretextual justification for his higher pay. (Doc. 42 at 10). Mattila contends that when Michelotti started at NorthWestern, they were on "equal footing" because Michelotti had not done EIM trading in the same manner as it was performed at NorthWestern. (*Id.;* Doc. 41-4 at 17, 67:11–23). However, Mattila's argument ignores that Michelotti's credentials and relevant experience as an RTS exceeded Mattila's. Further, even if Michelotti had not done EIM trading as it was performed at NorthWestern, his previous experience in EIM gave him a greater knowledge base than Mattila, who had no experience in EIM.

Mattila further contends that male employees received higher annual raises than her based on gender. (Doc. 4, ¶ 25). NorthWestern argues that employee performance is the primary factor when determining raises, and there is no evidence that any difference is attributed to gender. (Doc. 36 at 14). In response, Mattila argues that male employees were disproportionately given higher raises to catch their salaries up to longer-tenured female employees. (Doc. 42 at 9).

NorthWestern consistently gave Mattila raises in line with the average RTS employee. From 2017–2024, Mattila received an average raise of 3.6%, while RTS

9

employees received an average raise of 3.7%. (Doc. 37-2, ¶ 32). Mattila does not point to any specific male employees in her Amended Complaint or in her response to NorthWestern's summary judgment that received higher raises. (*See* Docs 4, 42). However, in her deposition, she alleges that Danny Mannix, a male RTS, received higher annual raises than her. (Doc. 48-4 at 4, 15:22–16:3).

NorthWestern bases its pay increases on its guidepost structure, which dictates how it slots and pays each employee with respect to their work group, along with yearly performance evaluations. (Doc. 37-3, ¶ 10). In 2021 and 2022 Mannix received a higher percentage raise than Mattila. (Doc. 37, ¶ 50). During this timeframe, Mannix received a higher rating for his job performance ("exceeds expectations") than Mattila ("meets expectations") and was moved from Guidepost 5 to Guidepost 6. (*Id.*, ¶ 12; Doc. 37-2, ¶¶ 32, 40). As a result, he received larger pay increases. Likewise, in 2019, Mattila was rated as "exceeds expectations" and was moved from Guidepost 8 to Guidepost 9 (the highest possible guidepost). As a result, she received a pay increase of 8.75%, a 1.5% higher raise than the average salary increases for RTS employees that year (Doc. 37-2, ¶¶ 32).

Additionally, Mattila received a higher annual raise than Mannix in 2020 and 2023. (*Id.*, ¶¶ 32, 40). It is also important to note that in the time periods that Mannix received a higher raise, Mattila was still paid almost $20,000 more in annual salary. (*Id.*). There is no evidence that Mannix received higher raises based on his gender.

NorthWestern has offered clear and evidence-based reasons for differences in raise percentages, and for two of the years Mattila alleges she received a lower raise, 2020 and 2023, she received a higher raise.

Mattila also argues that male employees were given training opportunities not offered to her, which allowed them to obtain better employment positions within the company. (Doc. 4, ¶ 36). NorthWestern contends that not every employee receives identical training and that Mattila was given training opportunities not offered to other male RTS employees. (Doc. 36 at 17).

Mattila identified Alex Murphy as an individual who received additional EIM training not offered her. (Doc. 41-4 at 5). According to Murphy's affidavit, he knew NorthWestern was beginning to enter the EIM market and advised his supervisors that he was interested in the area. (Doc. 37-4 at 2–3). As a result, in December 2019, he was asked to attend EIM training in Sacramento, California. (*Id.* at 3). According to Mattila's deposition, she was unaware that additional EIM training was available and did not request training in that area. (Doc. 48-4 at 7, 25:24–26:2). The evidence demonstrates that NorthWestern sent Murphy to the training based on his request to his supervisors rather than for any gender-based reasons.

Mattila also contends that she was denied the opportunity to attend North American Reliability Corporation ("NERC") training. (Doc. 41-4 at 14, 54:16–23). NERC trains power system operators, a different position within NorthWestern

11

than RTSs, and no other RTS scheduler, male or female, has ever attended NERC training. (Doc. 37-1, ¶¶ 12–13).

Further, NorthWestern has given Mattila training opportunities other male RTS employees did not receive. Mattila attended Leadership NorthWestern, a program designed to build business acumen and relationships across NorthWestern. (Doc. 37-1, ¶¶ 17–18). Mattila was accepted into the program partially based on Doug Peoples's recommendation. (Id., ¶ 19). Other male RTS employees have not been given the chance to participate in the program. (Id.). Mattila was also selected to attend the Northwest Wholesale Power Markets Conference in Portland, Oregon. (Id., ¶ 20). Mattila attended the conference along with two other RTS employees, Lisa Barkell and Chris Benski; other male and female RTS employees were not selected to attend the conference. (Id.). Mattila has failed to provide any evidence that would create a genuine dispute of material fact as to whether she was denied training opportunities based on her gender.

Last, Mattila's claim that she was denied promotional opportunities within NorthWestern based on the trainings she did not participate in lacks merit. Mattila did not apply for the supervisory positions given to other RTS employees and she presents no evidence that the promotions were influenced by gender biases. (Doc. 37-1 at ¶ 9, 28).

12

Mattila's only evidence for gender disparity in pay comes from her conclusory allegation that an "old boy's network" motivated her supervisor to suppress her pay so that male employees could catch up to her significantly higher salary. (Doc. 48-4 at 9–10, 33:1–4; 39:15–18). No evidence offered by Mattila supports this allegation. Mattila testified that her supervisor, Doug Peoples, told her that "We all do the same job; therefore, they deserve to make the same pay." (*Id.* at 10, 39:12–14). However, none of Peoples's statements about salary, pay raises, or training indicate that any decisions were made based on the gender of NorthWestern employees.

In sum, Mattila has failed to establish a prima facie case of discrimination under the EPA regarding her annual salary and the training opportunities offered. Mattila is currently the highest-paid RTS employee, and from 2020–2024, only one male RTS employee, Michelotti, was paid more than her. Mattila has also been offered training opportunities that other male RTS schedulers have not received, and there is no evidence that she was denied training opportunities based on her gender. While Mattila can potentially establish a prima facie case of discrimination based on the difference in raises she and Mannix received in 2021 and 2022, NorthWestern has demonstrated that the differences were based on a merit system, one of the four exceptions under the EPA. In addition, Mattila received a higher raise than Mannix in 2020 and 2023, and continues to be paid a significantly

higher annual salary. Because no genuine dispute of material fact exists as to whether NorthWestern discriminated against Mattila based on her gender, the Court grants summary judgment to NorthWestern on the EPA claim.

B.    *Title VII Claims (Counts II and V)*

Under Counts II and V, Mattila alleges that NorthWestern violated Title VII by paying Mattila differently than other NorthWestern employees based on her gender. (Doc. 4, ¶¶ 38, 60–61). NorthWestern argues that summary judgment is appropriate on these claims because when a plaintiff alleges they were denied equal pay for equal work under Title VII, EPA standards apply, and NorthWestern has presented substantial credible evidence of non-discriminatory reasons for their compensation decisions in the section of their brief addressing the EPA. (Doc. 36 at 20). In response, Mattila argues that the reasons offered by NorthWestern for any differences in pay are pretextual. (Doc. 42 at 13).

Title VII claims are analyzed based on the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, a plaintiff must establish a prima facie case of disparate treatment. *Noyes v. Kelly Servs.*, 483 F.3d 1163, 1168 (9th Cir. 2007). Once, the plaintiff establishes a prima facie case, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang v. Univ. of Cal. Dais, Bd. of Trs.*, 225 F.3d 1115, 1123–24 (9th Cir.

14

2000). If the employer meets this burden, then the plaintiff must raise a triable issue of material fact, that demonstrates the employer's reasons for the challenged action are pretextual and "a discriminatory reason more likely motivated the employer." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1091 (9th Cir. 2008) (quoting *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). "Alternatively, an employee may offer evidence 'that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Cornwell*, 493 F.3d at 1028).

Title VII and the EPA overlap because both statutes make it unlawful to pay employees different wages based on the person's gender. *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986). When a Title VII claimant contends that she has been denied equal pay for substantially equal work, as is the case here, EPA standards apply. *Id.* Title VII incorporates the defenses under the EPA, so when a defendant proves one of the defenses, they cannot be held liable under either the EPA or Title VII. *Id.* (citing *Gunther v. Cnty. of Washington*, 623 F.2d 1303, 1311 9th Cir. 1979), *aff'd* 452 U.S. 161 (1981)).

As discussed in Subsection *A* (EPA Claim), Mattila has failed to prove a prima facie case of discrimination concerning her annual pay or the training opportunities she received. Further, while Mattila can potentially establish a prima facie case of discrimination based on the differences in raise percentages between her and Mannix in 2021 and 2022, NorthWestern has offered non-pretextual merit-based

justifications for the differences. Mattila also received a higher percentage raise in 2020 and 2023 than Mannix and continues to receive a significantly higher salary. Because Mattila is contending that she was denied equal pay for substantially equal work as an RTS, NorthWestern cannot be held liable under Title VII since they have proved one of the defenses under the EPA. Therefore, this Court grants summary judgment on Mattila's two Title VII claims.

### C.    Punitive Damages

Because this Court has granted summary judgment to NorthWestern on all of Mattila's claims, there is no need to consider whether punitive damages are appropriate because punitive damages claims are not an independent cause of action. *See London v. Sears, Roebuck & Co.*, 458 Fed. Appx. 649, 651 (9th Cir. 2011) ("Because we affirm the district court's summary judgment dismissal, we need not consider London's claims for punitive damages); *Nelson v. Original Smith & Wesson Bus. Entities*, 2010 WL 7125186 at *4 (D. Alaska May 18, 2010) ("The motion to dismiss … is granted with respect to Counts 1, 2, 3, and 4 … The Court need not address Counts 5 and 6 for damages and punitive damages, as such claims are not independent causes of action."), *recon. denied*, 2010 WL 7125187 (D. Alaska June 14, 2020), *aff'd*, 449 Fed. Appx. 581 (9th Cir. 2011).

///

///

16

## IV.    Conclusion

IT IS HEREBY ORDERED that NorthWestern's Motion for Summary Judgment is GRANTED as to all remaining counts in Mattila's Amended Complaint.

The Clerk of Court is directed to enter judgment and close this matter.

DATED this 15th day of April, 2025.

*Susan P. Watters*

SUSAN P. WATTERS
United States District Judge